IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


XYZ CORPORATION,                          )   Docket No. 24 C 2939
                                          )
                    Plaintiff,            )
                                          )
             vs.                          )
                                          )
THE INDIVIDUALS, CORPORATIONS,            )   Chicago, Illinois
LIMITED LIABILITY COMPANIES,              )   June 5, 2024
PARTNERSHIPS AND UNINCORPORATED           )   9:45 o'clock a.m.
ASSOCIATIONS IDENTIFIED IN SCHEDULE       )
A HERETO,                                 )
                                          )
                    Defendants.           )


                    TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MATTHEW F. KENNELLY


APPEARANCES:


For the Plaintiff:     BAYRAMOGLU LAW OFFICES LLC
                       BY:  MR. SHAWN ANTHONY MANGANO
                       605 N Michigan Ave., 4th Floor, #5456
                       Chicago, IL 60611
                       (702) 462-5973


Court Reporter:        MS. CAROLYN R. COX, RPR, CRR, FCRR
                       Official Court Reporter
                       219 S. Dearborn Street, Suite 2102
                       Chicago, Illinois  60604
                       (312) 435-5639

APPEARANCES CONTINUED:


For Defendant BIRW:     GETECH LAW LLC
                        BY:  MS GE LEI
                        203 North LaSalle Street, Suite 2100
                        Chicago, IL  60602
                        (312) 888-6633



For Defendants
ANHEUM, StunningQueen,
ADHOWBEW, Aojingyibin,
BTLYUIOAPE, Febecool,
FQZWONG,
Goddess Accent 15-18 Days Delivery,
Hjgjhgf,
Holiday Deals-7-15 Days Delivery-Ruisiqi Trading,
Iuebc_NHF, Kenvina,
Lcyhony 2023 Black Friday Deals-7-20 Days Delivery,
MABUTINGTI, Tang Jian,
Tantisy Easter Day Big Promotion,
Taymeis women's store,
Yantihe, ZWSPTO-US, and
ZXTC:                   AU LLC
                        BY:  MR. ADAM EDWARD URBANCZYK
                        444 W. Lake St.
                        17th Floor
                        Chicago, IL 60606
                        (312) 715-7312

For Defendants
FANDEE, Runwind, Nmoder,
JTNFairy, LightlyKiss,
TDiooCor, LaiyiVic, Glozeplus,
MsavigVice, Sexycherry, SeNight,
SxClub, Yiershu, VisiChenup,
PaladMom, PerZeal, LalaLin,
Yajedo, and
Angerella Fashion:      WHITEWOOD LAW PLLC
                        BY:  MR. KEATON DAVID SMITH
                        111 W. Jackson BLVD, Suite 1700
                        Chicago, IL 60604
                        (917) 858-8018

APPEARANCES CONTINUED:

                              VALAUSKAS CORDER
                              BY:  MS. ALLISON MICHELLE CORDER
                              150 South Wacker Drive, Suite 1650
                              Chicago, IL  60606
                              (312) 673-0360


For Defendants
The Individuals, Corporations, Limited Liability Companies,
Partnerships and Unincorporated Associations Identified in
Schedule A Hereto:       DYKEMA GOSSETT PLLC
                              BY:  MR. MICHAEL P. ADAMS
                              111 Congress Ave, Suite 1800
                              Austin, TX 78701
                              (512) 703-6300


For Defendants
TieBnss, IbuduSexy, Oxgmoky
MOJICK, Bttup, DinyIn
HugeNice, Knoint, ZonJie,
and SheKiss:             SOLTER IP LAW, LLC
                              BY:  MR. BENJAMIN SOLTER
                              421 W Huron St, Apt 801
                              Chicago, IL 60654
                              (781) 752-6369


For Defendant
Melliflo:                DIRECTION IP LAW
                              BY:  MR. STEVEN G. KALBERG
                              P.O. Box 14184
                              Chicago, IL  60614
                              (847) 508-1294

(The following proceedings were had in open court:)

THE CLERK: Case 24 C 2939, XYZ corporation v. The Individuals.

THE COURT: Hi. Anybody planning to stand up? Just come up here, give your names. I need people to come up to the podium and give your names. Just like it's court. Just saying.

MR. DROTER: Good morning, your Honor. Joseph Droter here for plaintiff.

THE COURT: I'm sorry. Say it again.

MR. DROTER: Joseph Droter here for plaintiff.

THE COURT: Spell the last name.

MR. DROTER: D as in David, R-O-T-E-R.

THE COURT: Just like it sounds. All right. Are you going to say who you are?

MR. SOLTER: Benjamin Solter for defendants, ten of the stores.

THE COURT: Which defendant?

MR. SOLTER: Ten of the stores.

THE COURT: Ten of the stores. That's good enough. Yeah, it would be a little cumbersome to try to put them all on the record.

Next.

MR. ADAMS: Michael Adams. I represent the defendants identified in docket 31, three of the stores.

THE COURT: That's a good way of doing it too.

Okay. I'm sorry. It was Mr. Adams, right?

MR. ADAMS: Yes, your Honor.

THE COURT: Got it.

MS. CORDER: Good morning. My name is Allison Corder. I represent 19 defendants, Angerella Fashion Group.

THE COURT: Corder with a D or a T?

MS. CORDER: D.

THE COURT: Thanks.

Hello.

MR. SMITH: My name is Keaton Smith. I'm here alongside Ms. Corder.

THE COURT: With her. Okay.

MR. URBANCZYK: Good morning, your Honor. Adam Urbanczyk for the ANHEUM group of defendants at docket 59.

THE COURT: I have talked to Mr. Urbanczyk probably 5,000 times. I don't think I've ever seen you in real life before.

MR. URBANCZYK: This is a first, your Honor.

THE COURT: Nice to meet you Mr. Urbanczyk. It's got to be close to 5,000, maybe 4,000. I don't know.

MS. LEI: Good morning, your Honor. This is Ge Lei for one defendant spelled as B-I-R-W. I filed an appearance for docket number 58.

THE COURT: Okay. Spell your surname.

MS. LEI: First name G-E, last name L-E-I.

THE COURT: Thanks. Okay.

So I have looked at everything, and I think -- you'll tell me if I'm wrong -- it seems to me -- so if I'm understanding it correctly, all of the defendants who are here before me today are challenging personal jurisdiction. If that's wrong, somebody raise your hand and tell me it's wrong.

You're not challenging.

MR. ADAMS: I'm not challenging.

THE COURT: Which defendant or defendants do you represent?

MR. ADAMS: The group that are identified in docket 31.

THE COURT: Let me just look up and see who those are. I may have assumed too much. Give me just a second.

So the first one of those defendants is called Floerns, F-L-O-E-R-N-S, Store. Do you know which -- so which response -- what's the docket number for your response to the motion for a preliminary injunction? There is about five or six of them. I just want to make sure I'm looking at the right one.

MR. ADAMS: Just a second. Docket 65.

THE COURT: 65.

MR. ADAMS: Primary basis, your Honor, is we allege that there's no evidence of copying.

THE COURT: Got it. Okay. All right. So I'm going to put him aside for a second.

So aside from him, all of the other defendants are challenging personal jurisdiction.

MR. URBANCZYK: Your Honor, within our group, the one defendant, ANHEUM, is not contesting personal jurisdiction, based on number of its sales. And in the group one, we described in our motion in docket 59, in plaintiff's reply, they included some evidence of test purchases that were made for three --

THE COURT: Yeah, I'm going to get to that in a second.

MR. URBANCZYK: Okay. So I guess there are some exceptions to --

THE COURT: Okay. So here's my question about the test purchases things. As I understand it, there were no -- you don't have any evidence of any -- with regard to the people who are challenging personal jurisdiction, you don't have any evidence of any actual sales into Illinois before the lawsuit was filed. Is that right or not right?

MR. DROTER: Before the lawsuit, correct.

THE COURT: Okay. So to me the question is whether a post-lawsuit sale is sufficient to establish -- to support personal jurisdiction. And I guess I sort of question whether it is. I mean, you can file a new lawsuit, I suppose. But do

you have any authority for -- because the way that this -- the way the Seventh Circuit has looked at this under the -- I think it's the NBA Properties case is the Seventh Circuit has basically said that -- and I know that there's some district court cases about this -- that basically said that just the fact that you have a website that's available to be -- for somebody in Illinois to buy something isn't enough. Right?

You have to have targeted it, and then the question is, what's targeting? We know one sale is enough for targeting, and that can even be a test sale done by somebody acting on behalf of the plaintiff. You don't have any test sales with regard to the people who are challenging personal jurisdiction that predate the lawsuit, right?

MR. DROTER: That predates the lawsuit, no.

THE COURT: Okay. So it would seem to me that the question on those defendants -- and maybe it ends up being the same question for others too -- but the question on those defendants is, is what they did before the lawsuit enough or does what they did after the lawsuit count for personal jurisdiction? I guess I'm skeptical about that.

Do you have any authority that says that a post-lawsuit sale is enough?

MR. DROTER: Regarding a post-lawsuit sale, no, but we were focusing on the NBA case where even with one sale does consider personal jurisdiction.

THE COURT: Yeah.

MR. DROTER: However, with these -- when we ran this test after the last telephonic hearing, you know, we -- essentially the same exact process, new copyright registrations that our client has. The same defendants that are in this lawsuit, we were able to easily purchase these items. Many of them have been delivered, you know -- and more than just one defendant that we have been able to successfully order, place, and receive.

THE COURT: So this may get back to the point that Mr. Urbanczyk was about to start talking about. Do any of the defendants want to talk about the proposition of whether -- if there's no pre-lawsuit sales but there is a post-lawsuit sale, is that enough?

I'm not seeing anybody jump to the podium.

I will just tell you I was kind of skeptical about it. If nobody's going to challenge it, that's okay. Just as an initial matter, I was kind of skeptical about it.

MR. URBANCZYK: Your Honor, we didn't file a surreply. I would say the mechanism a plaintiff might utilize would be to request leave to amend the complaint to change the allegations.

THE COURT: In other words, you could easily get around it, in other words.

MR. URBANCZYK: Yes.

THE COURT: In other words, if there was no pre-lawsuit sale, then a post-lawsuit sale wasn't enough. But you did a post-lawsuit sale. You could get around the before-and-after problem by just amending your complaint after the fact and alleging the sales.

MR. URBANCZYK: I believe so, although this is a preliminary injunction hearing. So does that --

THE COURT: Yeah. Fair enough. But yeah.

MR. URBANCZYK: Does that allow the plaintiff to meet its evidentiary burden under Rule 65, which we haven't briefed out.

THE COURT: Okay.

MR. DROTER: Your Honor, if I may also add, in regards to the third-party platform, Amazon for this case, we have reached out to them to get specific Illinois sales. When they first complied with the TRO, they just gave U.S. sales. And we're now narrowing it down to just Illinois sales.

THE COURT: Trying to get a state. Yeah.

MR. DROTER: So, you know, if we need to or have to, some jurisdictional discovery --

THE COURT: What's the timing of when you expect to get that from Amazon?

MR. DROTER: They didn't give -- they acknowledged receipt. I'd have to look into it. They didn't give an exact turn around time. I would think it would be similar with the

TRO compliance, which took them about a week to do.

THE COURT: So that's the normal turnaround time on those types of things?

MR. DROTER: At least with that third-party platform.

THE COURT: With Amazon. Yeah, it might be longer for others. Yeah. Okay.

MR. DROTER: Right. So we're waiting to hear back on that. We have already reached out. And I would more than likely assume -- based on the ease of ordering these test items that we got, I can more than likely foresee that we will see more Illinois sales prior to the lawsuit after Amazon gets back to us.

THE COURT: Okay. Let me go about it this way. So we're here for a hearing on the motion for preliminary injunction. I think the TRO expires today or expires tomorrow, somewhere in there.

On the defense side, does anybody want to argue that personal jurisdiction is lacking and that's a reason why there shouldn't be a preliminary injunction? If so, raise your hand.

Okay. Mr. Solter. Come on up. Give it a try. It's better to come up here. That way you don't have to be adjusting microphones.

MR. SOLTER: So I have a slightly different argument. So there is a large number of cases that have the sales of a

trademarked good that establishes personal jurisdiction. But to me it's not as clear that sales addressed in an image is going to provide personal jurisdiction. So if the images themselves had been sold in Illinois, which has not been alleged, I think there certainly would be jurisdiction. But I was not able to find any cases that clearly established that sales of the product in the image are enough for jurisdiction, even if there are sales in Illinois.

THE COURT: Okay. I get what you're saying. And NBA Properties is a trademark case, not a copyright case.

MR. SOLTER: Yeah, all of the Seventh Circuit cases --

THE COURT: They're all trademark cases. Yeah.

MR. SOLTER: Yeah. And I couldn't find any that was just purely copyright.

THE COURT: Okay. Just keep a mental inventory. You're going to get to talk last.

It's Ms. Corder, right?

MS. CORDER: Yes, Allison Corder.

I'd like to touch on what he mentioned. So we don't have the deposit materials, the underlying copyrighted works of the registrations.

THE COURT: So you're dealing with a generalist here, not a copyright lawyer. When you say the deposited material, let me tell you what I think that means. You'll tell me. So

when somebody files for a copyright, they actually have to give something to the copyright office. Is that the deposited materials?

MS. CORDER: Correct.

So you file a copyright application. You list date of creation, the filing date, other particulars, and then you include --

THE COURT: And you say, here it is.

MS. CORDER: And you include all of the copyrighted rights. So on some of the copyright registrations include 300-some images.

THE COURT: All in one registration?

MS. CORDER: Correct.

THE COURT: Okay.

MS. CORDER: So we don't have access to what those --

THE COURT: What's the significance of that?

MS. CORDER: So you could do a substantial similarity analysis.

THE COURT: That's not really a personal jurisdiction issue, though. That's a copyrightability, or it's an infringement issue or both.

MS. CORDER: Correct. But touching on the personal jurisdiction issue, we don't know when these test purchases were made. Some of the exhibits included sales, but the images for the product purchased were questionable on whether

indeed, those were the copyrighted images and if these were even up at the time. Do these purchases, even these subsequent purchases made after the filing of the complaint --

THE COURT: Okay. Again, let me just tell you what I think I just heard, and you'll tell me if I got it right.

So some of the post-lawsuit purchases, it's not clear to you at this point whether the photographs that would have been used by the people who made those sales are the same or substantially similar -- or whatever the lingo is in copyright law -- to whatever was deposited. Am I hearing it right?

MS. CORDER: Correct.

THE COURT: Okay.

MS. CORDER: Yeah, and one other point. Out of our 19 defendants, there's no evidence for ten of them, and five it was only alleged that they were infringing an unregistered copyright. So there's not enough evidence to state a claim as far as why some of our defendants are included in this lawsuit when there's been no evidence provided.

THE COURT: Your filing in response is which docket number, if you know? It's not 65. We know that. Are you the Angerella defendants?

MS. CORDER: Correct.

THE COURT: So it's 66.

MS. CORDER: 66.

So we actually put together a chart of our

19 defendants to --

THE COURT: Which exhibit? Is that one of the exhibits?

MS. CORDER: It's not one of the exhibits. This was made in response to their -- the response that they submitted.

THE COURT: Okay. You got something you want to show me?

MS. CORDER: If we may.

THE COURT: Yeah.

Do we know if the ELMO is working? It's probably not, right?

The system is kind of down except for the sound. If you got copies of it, you can pass them out.

MS. CORDER: Yes.

THE COURT: Yeah. Okay.

Otherwise, I'd have you put it on an ELMO, but I don't think it's working.

MS. CORDER: May I approach the bench?

THE COURT: Just give it to her.

Thanks.

Okay. So what am I looking at here?

MS. CORDER: So what you're looking at is all of the evidence that the plaintiffs put together.

THE COURT: This is basically a spreadsheet that basically says, for each one of your defendants, starting with

Angerella Fashion, what you've found in the plaintiff's materials in terms of the test buy, if there was one; the evidence picture, I assume that means what was attached to the plaintiff's stuff; copyrighted image, if there was one; and then the copyright number, if there was one.

Okay. So what am I supposed to glean from this?

MS. CORDER: I think this goes back to this personal jurisdiction of whether they even have a valid claim. You know, how are they demonstrating that we actually -- there was an actual copying going on? Again, I'm deferring back to knowing what the deposit materials or the images that were actually copyrighted and submitted with the U.S. federal copyright office.

THE COURT: Is the deposited materials what you would find in the column that says "copyright image"?

MS. CORDER: Yes. But we don't know, so we're going off of --

THE COURT: And you don't know because?

MS. CORDER: We haven't looked at the actual copyright registration.

THE COURT: Okay. So this is going to sound like a dumb question probably, but how come you haven't looked at the actual copyright registration?

MS. CORDER: Well, we've asked plaintiff's counsel to produce this.

THE COURT: Can anybody just go get it?

MS. CORDER: No. It's not that easy. You have to fill out a request, and we would think that plaintiff's counsel would have that easily.

THE COURT: Would have it.

So you asked for it when? Within the last couple weeks, obviously? Everything's happened within the last couple weeks in the case.

MS. CORDER: I think -- yeah.

THE COURT: Did anybody respond to you on the plaintiff's side, or were you told to go jump in the lake or what?

MS. CORDER: We haven't received --

THE COURT: No response. Not even no. It's not yes, not no. Just nothing.

MS. CORDER: Not that I'm aware of.

THE COURT: Radio silence, in other words.

MS. CORDER: Yes.

Are you aware of --

MR. SMITH: No. I'm not aware of any response.

THE COURT: Okay. So I'm just making an inventory of arguments here. So I've got the copyright personal jurisdiction -- this is Mr. Solter's argument. Is copyright personal jurisdiction the same as trademark personal jurisdiction.

From Ms. Corder, I've got can't say -- this is my shorthand for it. Can't say that accused image matches deposited image, right? It's good enough for shorthand?

MS. CORDER: Yeah, that works.

THE COURT: What else did you want to say? Anything right now?

MS. CORDER: I think that's it for now.

THE COURT: Okay. Ms. Lei?

MS. LEI: Yes.

THE COURT: Do you know what docket number your response is?

MS. LEI: We filed motion for extension of time.

THE COURT: You're the one who filed the motion like yesterday?

MS. LEI: Yeah. Because we came in late. We just represent this one defendant. We have several arguments.

THE COURT: Okay.

MS. LEI: First we have the personal jurisdiction because we only have one defendant. There's absolutely no sales between Illinois, either pre or --

THE COURT: Before or after.

MS. LEI: Correct.

And also, second, we have a misjoinder issue. There are 175 defendants, ten different copyright registration, and also I believe covering like 4,713 different works. And --

THE COURT:  How many?  How many again?

MS. LEI:  4,713 different works.  The group registration, so a bunch of photos registered together.  So we believe they're covering 4,713 different works.

So due to the significant number of different works at issue, different actions cannot be in the same transaction occurrence or series of transactional occurrences.

THE COURT:  Why isn't this a series of transactional occurrences?  It seems to me it's pretty darn likely that -- let's say -- let me just give some hypothetical examples here.

So defendant 1 is alleged to have infringed images 1, 3, and 5.  Defendant 2 is alleged to have infringed images 3, 5, and maybe 14.  Defendant 3 is alleged to have infringed image 5, maybe 17 and 20.  Why wouldn't that be -- and I'm assuming that's the case here.  If it is, why wouldn't that be enough for a series of transactions or occurrences?

MS. LEI:  It's not a series of transactions.  All these defendants --

THE COURT:  Why?  The question is why?  You're saying it's not.  I want to know why it's not.

MS. LEI:  Because those defendants -- they're not related.

THE COURT:  How do I know that?

MS. LEI:  Those --

THE COURT:  How do I know they're not related?

They're all doing the same thing in the same way, or overlapping things in the same way. Why wouldn't that be enough to show that they're related at least for getting past the joinder requirement at the initial stages of the case?

MS. LEI: I'm just curious why they're doing it in the same way because it's different work.

THE COURT: So you're asking me a question, in other words. It doesn't work that way.

MS. LEI: I'm saying the same way they set up an Amazon --

THE COURT: Here's the problem. You know, I've had, you know, plenty of phone hearings, not a whole lot of live hearing in these things. So a person -- and let's not talk about this plaintiff. Let's talk about a hypothetical holder of some intellectual property right, whether it's a trademark or a copyright. Okay.

And it's not like 30 years ago where it was Macy's that was selling this stuff. There's, like, thousands of people selling this stuff, maybe more than thousands of people selling this stuff. And when you sue one, they shut down -- and we know that this is true. This is absolutely, one hundred percent true because I'm not required to just look at this case. I can look at the whole several thousand cases like this I've had. If you sue that one, they shut down the website; they open a new one tomorrow. Then you sue that one.

They shut down that website; they open a new one tomorrow. You shut that one down; they open a new one tomorrow.

It would be crazy -- maybe "insane" would be a better word than "crazy" -- to require somebody to go sue those people one at a time. What these cases go back to is Grateful Dead concerts. Raise your hand if you know what the Grateful Dead is. Okay. That's good. I was afraid I was going to get one hand.

As luck would have it, when I was a practicing lawyer, the one trademark case I did was in about 1997. It was a couple years before I went on the bench. And I represented a guy who had a handshake deal with the World Wrestling Federation to sell professional wrestling T-shirts. And I got this case on referral from a lawyer from New Jersey whose name was Jules something or other. And Jules was the guy who kind of invented the group lawsuits that were filed in Grateful Dead concerts.

What would happen at Grateful Dead concerts is that there would be this traveling band of people who would sell knockoff T-shirts of the Grateful Dead. They would go around from concert to concert. It was the same people all around the country. The concert was one day. And so if you waited to sue them, it was too late.

And so what would happen is that the Grateful Dead, by their lawyer, would go into town a few days before the

concert. They would go into court, sue anonymous defendants, get a temporary restraining order ordering the U.S. Marshal to seize the offending material in the parking lot of the stadium. These people would all show up. They'd come out with the marshal. They'd seize all this stuff, and then they'd continue to litigate the stuff after that.

Fast-forward 30 years to these kinds of cases. It's not practical -- and I know that some of my colleagues disagree with this, but I vehemently disagree with them. It is not practical to require people to file one lawsuit one at a time and go through this because it's like trying to drain Lake Michigan with a spoon. It's like trying to drain Lake Michigan with a spoon. It doesn't work. And basically your intellectual property right ends up being meaningless if that's what people have to do. Okay?

So that's the background. At least that's what I think of the background. And so now we go to the question of joinder.

So it seems to me that you've got a whole bunch of people -- and I know that you're saying this is not the case here. Okay? But let's -- in the hypothetical case you've got a whole bunch of people selling the same product or, let's say, using the same image in more or less the same way. To me that's enough, within some limits. I mean, I've had cases where people have tried to sue 900 defendants, or 954 I think

was the high end. That's enough to be a series of transactions of occurrence. I get that you're saying that it's not that situation here. We've got some people selling some images and other people selling other images. I get that that's an argument to be considered. I'm not sure that that's an appropriate reason to deny a preliminary injunction. That's maybe something we sort out down the road.

The problem is I can't extend the TRO anymore. I can't. The Seventh Circuit has said, if I extend it any more, it is a preliminary injunction. So I have to have a preliminary injunction hearing. I'm not going to be able to sort out for 165 defendants, or however many I got, who sold what images at this point.

So tell me why I'm wrong.

MS. LEI: Your Honor, I definitely appreciate the scenario you described, but I think it's not the case here. As I mentioned there are, like, 4,713 different works. And the thing is they're all selling different images.

THE COURT: Basically, you're saying they're trying to shove too much in one lawsuit.

MS. LEI: Correct, your Honor.

THE COURT: Even if they could do it hypothetically, that they've overdone it here.

MS. LEI: Correct, your Honor. There must be a limit. It's too much here.

THE COURT: Okay. And so where do I draw the line? What should I do?

MS. LEI: I think if it's similar images or the same images, maybe they can group into one lawsuit. They cover so many different works. We don't believe it's a series of transaction, that we're in the same series of transactions.

THE COURT: Okay. Thanks.

What other points would you like to make?

MS. LEI: Yes. And, also, there's no likelihood of success on the merits of the case.

THE COURT: Now we're talking about copyrightability basically?

MS. LEI: Correct, your Honor. So turning to my -- the facts pertaining to my client, so I asked opposing counsel, you know, of course for the copyright deposit and also a copy of their alleged infringing evidence of my client's. I haven't got any response from them. So I look at the docket.

THE COURT: Right.

MS. LEI: So there appears to be showing that there is one --

THE COURT: Tell me where you're looking so I can pull it up here and look at it too. Like, if you have a docket number or something.

MS. LEI: Since I haven't filed response, so I

prepared exhibit.

THE COURT: Okay. Do you have a copy you can give him and give me?

MS. LEI: Yeah, of course.

THE COURT: Great.

Jules Berman I think was his last name. It's a published article in the Law Review. At the end of this, I'll tell you my story from the bench trial I have in the case. I have a good story.

MS. LEI: So, your Honor, as you can see, the first image is their alleged copyright, and the second image is their alleged of my client's infringing image.

THE COURT: Okay. So the one in the middle is the one they say that your person put up.

MS. LEI: Correct.

THE COURT: And you're going to tell me that the one in the third column is the one you actually put up.

MS. LEI: Yeah. We never put up the second one.

THE COURT: Okay. So if I were to -- you just came in yesterday I know, within the last couple days, something like that.

MS. LEI: Correct, your Honor.

THE COURT: How do I know this?

MS. LEI: We have a declaration signed by my client.

THE COURT: Okay. That you're prepared to file?

MS. LEI:  Yes.

THE COURT:  Have you shown it to plaintiff's counsel?

MS. LEI:  I can right now.

THE COURT:  Not before today?

MS. LEI:  Okay.  Not before today.

THE COURT:  Okay.  Fine.

Then the declaration is going to say we never had this thing that you say we had.  We never used it.  The only thing we used that was close to this is this one in the third column, which is white as opposed to stripes or whatever those would be called.

MS. LEI:  Correct, your Honor.  We also have another issue with their copyright.  If I might?

THE COURT:  Okay.  Sure.

This is the same image that -- copyright.

MS. LEI:  Yes.  Correct.  The second one, if you look at the second one, this is from a third-party website.  So we did reverse search on Google, and we find this link showing the exact same image.

THE COURT:  When you say you did a reverse search on Google, now I'm more technologically savvy than the average 67-and-a-half-year-old person, but not that technically savvy. So how do you do a reverse Google search?

MS. LEI:  We just search similar images and we find --

THE COURT: I didn't know you could do that. Okay. You learn something new every day. It came up with the Amazon website.

MS. LEI: It's not Amazon website. It's a different site.

THE COURT: Okay.

MS. LEI: So the earliest comment we can find about this image is October 2022. It's what plaintiff alleges is the publication year. They didn't give the date.

THE COURT: Okay.

MS. LEI: So as you can see the true image is the image between the third-party image and the image that they said is their copyright image. It's very similar. Even --

THE COURT: So let me make sure I'm understanding what you're saying. So the thing that you just gave me here, which is --

MS. LEI: From third-party website.

THE COURT: This is not the plaintiff's.

MS. LEI: No.

THE COURT: It's somebody else's.

MS. LEI: Correct.

THE COURT: You're kind of telling me in a nice way that the plaintiff copied it.

MS. LEI: That is our belief.

THE COURT: It's not theirs. The plaintiff copied --

MS. LEI:  Correct.

THE COURT:  Okay.  All right.  I understand what you're saying.

MS. LEI:  Okay.  And we have two other issues.  So first is that we believe they're asking for too much from my client.  So even assuming that actual image, your Honor, the white suit one is the one that we are infringing, even though they don't even have a copyright to demonstrate that, even assuming that's the one, we only have 11 sales.  And the gross sales amount for this product.

THE COURT:  11 sales total?

MS. LEI:  11 units of sales total.  And the total revenue is $314.

THE COURT:  And how much is frozen?

MS. LEI:  350,000.

THE COURT:  350,000.  Got it.

MS. LEI:  That's substantial.  We don't believe that's appropriate.

THE COURT:  Okay.

MS. LEI:  And the final point to make is that we believe if plaintiff were going to win on this motion for preliminary injunction, we want the bond to be decreased substantially.  At least 350,000 from my client.

THE COURT:  Okay.  Thanks.

Who wants to go next I guess on this side?

Mr. Urbanczyk.

MR. URBANCZYK: Your Honor, just to add to the -- in addition to the personal jurisdiction argument you raised, as my colleague just mentioned, for our two groups, or our one group and then the ANHEUM defendants, if the Court wasn't inclined to deny the preliminary injunction for personal jurisdiction reasons, at a minimum, I think what the Court should do is reduce the scope of the asset restraint affecting the store fronts.

For the group 1, sub group --

THE COURT: So let me just -- so that whoever has to look at this some day knows what you're talking about, who is group 1?

MR. URBANCZYK: So group 1 is all of the defendants in docket 59 other than the defendant named ANHEUM.

THE COURT: Got it. Okay.

MR. URBANCZYK: So for that group supported by the Dang declaration, there were 15 items sold for a total of $457. This is against total asset restraint for that group of about $260,000. Now, even considering the post-case filing test purchases, it looks like there were three of those. So say we're looking at about $500 or so in total revenue of accused products. That's starkly contrasted against the 260K being frozen.

For the singular defendant ANHEUM, that declaration

shows 74 sales of accused items for a bit over a thousand dollars, $1,068.56. And that's against about $190,000 frozen. So the personal jurisdiction analysis can go on. Although, I think that this asset restraint focused under *Grupo* is more narrow, and I think the Court can make that determination before.

THE COURT: When you say "Grupo," you mean *Grupo Mexicano*. That's a Supreme Court case.

MR. URBANCZYK: Yes. We would just request that the Court --

THE COURT: If I grant the PI, lower the number?

MR. URBANCZYK: At a minimum, yes, please. Thank you.

THE COURT: Okay. It was Mr. Adams?

MR. ADAMS: Yes.

THE COURT: Mr. Adams, go ahead.

MR. ADAMS: I again represent the defendants that are identified in notice of appearance docket 31, and our response to the motion for preliminary injunction was docket 65.

THE COURT: Okay.

MR. ADAMS: Plaintiffs -- our position is that the preliminary injunction should not be granted because they can't prove a likelihood of success on one of the key elements, which is copying. We believe they have insufficient evidence of copying. In fact, we believe we can rebut that

there was any coping.

Plaintiff's position is that --

THE COURT: Is there something that's attached to your response or in your response that basically kind of illustrates that for me? Or an example of that?

MR. ADAMS: Well, let me explain the position first.

THE COURT: Okay.

MR. ADAMS: Because there really isn't a way to illustrate it.

THE COURT: Fair enough.

MR. ADAMS: So the plaintiffs take the position that defendants' practice is to copy plaintiff's photographs as soon as they appear on their website. They do not identify anywhere the date that those photos are put on the website; so we don't know what date. We do know that they claim that those photos are registered by copyrights and that those copyright registrations have publication dates that are in a range -- a large range of dates. This kind of goes back to that deposit copy issue.

Since they haven't provided the defendants the deposit copies, we don't know when those photos were published. Presumably they were published the day that they were put on the website. If they provided us the deposit copies, we would know that publication date, but we don't. The copyright registrations are for a group of photos, a large

number of photos as other defendants have stated. And the way it works when you register a large group of photos is you just have to identify a range of dates for when those photos were published.

THE COURT: So in other words, you don't have to identify on each one on an item-by-item basis?

MR. ADAMS: On the deposit copies you have to, but in the copyright registration document that's been attached to the pleadings --

THE COURT: Got it. Okay.

MR. ADAMS: -- all it says, for example, for one of the registrations that we're accused of infringing is that the 535 photos were published somewhere between July 28, '23, and November 8, '23.

THE COURT: So is the difference, whether it's July 28th or November whatever it was, is that meaningful?

MR. ADAMS: In order to register a group of photos, they all have to be --

THE COURT: Is it meaningful for this case?

MR. ADAMS: Yes.

THE COURT: Okay. Why is it meaningful for this case?

MR. ADAMS: Because I can show that the photos were taken before those dates.

THE COURT: When you say "the photos," you mean the

ones that were on your client's website?

MR. ADAMS: Yes. Yes. My clients, I have three stores. They're accused of infringing four photos. I know the dates when those photos were taken. I know when they were published on my client's website, and --

THE COURT: And it's somewhere between June -- July the 28th and November the 28th. And depending upon what the deposit copy says, it's going to tell you whether you were there first or they were.

MR. ADAMS: Exactly. I even have one situation where the photo was taken before that range. But I'm fairly certain that I can show that the photos were published on my client's website before they were published by the plaintiff, but I can't prove that definitively without seeing the deposit copies.

THE COURT: Okay. Thanks.

MR. ADAMS: The declarations that are in our response identify the dates of when the photos were taken.

THE COURT: When yours were taken.

MR. ADAMS: My client's photos were taken and when they were published.

THE COURT: So if you're identifying when they were taken, that's another way of saying that -- putting aside these date issues, we didn't copy them. We took our own pictures.

MR. ADAMS: Right.

THE COURT: Although, I suppose you could take a picture that is staged in the same way as a copyrighted picture and that would still be an infringement, at least arguably.

MR. ADAMS: I don't think so, because it would be an independent creation.

THE COURT: I actually had a trial about one of those once. Literally. It involved a sniper photograph. The jury found for the plaintiff.

MR. ADAMS: Did they? Okay. It's an interesting issue. But in my view, that would be an independent creation. But we didn't personally take the photos. We get them from our clothing suppliers. And we also in one case have -- I haven't submitted it.

THE COURT: You get it from your clothing suppliers. Okay. Your client -- you represent more than one obviously. Let's just take a hypothetical one.

MR. ADAMS: Right.

THE COURT: Your client sells clothing.

MR. ADAMS: Correct.

THE COURT: They don't make the clothing.

MR. ADAMS: Correct.

THE COURT: They get it from somebody else.

MR. ADAMS: Correct.

THE COURT: They don't take the photos; they get it from somebody else.

MR. ADAMS: Correct.

THE COURT: Macy's would the same thing probably.

MR. ADAMS: Right.

THE COURT: So what you're telling me is that -- well, actually, it's not what you're telling me. What you're telling me suggests as a possibility is that all of these photos are coming from the same place, maybe, and maybe they don't even belong really to the plaintiff, but whatever.

MR. ADAMS: Correct. I have one declaration from a photographer that took three of the four photos. The photographer hires out their services to the clothing suppliers.

THE COURT: Yeah.

MR. ADAMS: And he declares that he took the photos himself. He didn't give authorization to the plaintiff to use those photos. And that the photos were for purposes of giving them to the clothing supplier.

THE COURT: Okay.

MR. ADAMS: I haven't -- that declaration was not part of my response because I only got it this morning.

THE COURT: You didn't get it quick enough.

MR. ADAMS: If the Court would like, I can offer it into evidence.

THE COURT: All right. Thanks.

MR. ADAMS: Would you like me to offer it into evidence, your Honor?

THE COURT: You decide.

MR. ADAMS: I would like to offer it into evidence.

THE COURT: Okay. All right. You're going to give one to him, right?

MR. ADAMS: Yes.

THE COURT: This is a declaration from somebody named -- I'm going to botch the pronunciation, apologies -- Zhou Hongyi, Z-H-O-U, H-O-N-G-Y-I, who says: "I'm a photographer. I take photographs of models wearing clothing products supplied by clothing suppliers who hire me. I took these three photos."

He identifies three photos here, or he shows -- I don't know if it's a he or she, the photographer. Attaches three photographs.

"I'm the person who took them. I didn't get them from anybody else."

And so what you're telling me now is that these images that are under paragraph 3 on page 2 of this person's affidavit, those are the images that the plaintiff is saying are their copyrighted images?

MR. ADAMS: Correct. And they're the images that we're accused of infringing.

THE COURT: Okay. Got it.

All right. Thanks.

MR. ADAMS: Thank you, your Honor.

THE COURT: Okay. So Mr. Droter, you got a lot of stuff to deal with there. I'm going to let you do it in whatever sequence you think is --

MR. SOLTER: Thank you, your Honor. I made the one argument about the preliminary --

THE COURT: Did you have something else to say?

MR. SOLTER: About the personal jurisdiction. I do.

THE COURT: Go ahead and finish.

MR. SOLTER: That was the only thing I addressed at the time. Sorry about that.

So one thing I'd like to point out in this case is that throughout the complaint and the request for the preliminary injunction, plaintiff mentions that all the defendants went to their website and copied these images from their website.

But from discussing it with my clients, if they -- well, first of all, they have declarations that none of them had heard of this website before. But, also, if you try to access the Rotita website from China, it's inaccessible. They've all gotten the same --

THE COURT: Okay. There's a bunch packed into that sentence. The Rotita website. Is that the plaintiff's --

MR. SOLTER: Yeah. The plaintiff's clothing website.

THE COURT: You can't get it from China.

MR. SOLTER: You can't get it from China.

THE COURT: And your clients are all in China.

MR. SOLTER: My clients are all in China.

THE COURT: Why can't they get it from China?

MR. SOLTER: It's basically blocked. It appears -- it's blocked by -- not the Chinese government, because I know they block some websites. But in this case it appears that it's blocked by the Rotita website itself because they all get the same notification that the website's under maintenance and is not accessible.

THE COURT: Anyway. Go ahead and continue the point. I just want to make sure I got what you're saying.

MR. SOLTER: Yes.

So I think that goes to, like, first of all, damages because there can't be any willful --

THE COURT: But it goes to copying too.

MR. SOLTER: Yeah. It goes to the copying as well because if there's no access to the website, then there can be no copying directly from plaintiff's website. The thing that I don't know is how long this website has been inaccessible in China, whether this is a recent thing. I only found out about it I think last week.

THE COURT: Okay. All right. Thanks.

MR. SOLTER: Sorry. Let me just continue, if you don't mind.

There's -- also with one of the stores, IbuduSexy, there's, in my opinion, no infringement of the copyright. I haven't included copies today, but I have that in my briefings.

THE COURT: Which brief -- which response is yours? What's the docket number?

MR. SOLTER: My docket number is 73.

THE COURT: 73. And so what attachment to 73?

MR. SOLTER: It's included in the brief itself.

THE COURT: Yours isn't 73. 73 is the plaintiff's reply.

MR. SOLTER: Excuse me. Sorry. Mine is 64.

THE COURT: 64.

MR. SOLTER: Yeah.

THE COURT: I got it. 64. And which page of the brief should I look at?

MR. SOLTER: It's on page 5.

THE COURT: I'm going to hold up my iPad. It's this right here?

MR. SOLTER: Yes.

THE COURT: You're saying -- this is for one of the clients that you represent.

MR. SOLTER: That's correct.

THE COURT: You're basically saying those two things don't look anything alike. That's not an infringement under any stretch of anybody's imagination.

MR. SOLTER: That's correct.

THE COURT: Which you're kind of right on, if that's what's being accused.

MR. SOLTER: That was from their exhibit.

THE COURT: It's from their exhibit.

MR. SOLTER: It's from their exhibit, yes.

THE COURT: Okay.

MR. SOLTER: And, also, I've also requested copies of the original copyrights as well, which plaintiff didn't send to me as well. I just wanted to point that out.

THE COURT: Did you get a refusal, or you just didn't get a response?

MR. SOLTER: I didn't get a response. They addressed other issues, but didn't respond to that.

And, finally, I am requesting that -- my client's filed -- if you do decide to grant the preliminary injunction that my clients have the opportunity to file a bond instead and have the remaining assets unfrozen.

THE COURT: Got it. A bond in what amount?

MR. SOLTER: A bond that is in the amount based on their sales, which I've included as an exhibit.

THE COURT: What's the total amount of sales that

you've got?

MR. SOLTER:  It's over -- for all of my clients, the total amount of sales was over 200,000.

THE COURT:  Okay.

MR. SOLTER:  And I have declarations from each of the store owners.

THE COURT:  So let's say it's 200,000.  What's the amount of the bond that you want to put up as opposed to having the account frozen?

MR. SOLTER:  It's dependent on each store.

THE COURT:  What's the total so I have it, so I'm comparing apples to apples.  Ballpark.

MR. SOLTER:  I actually might have that in there.  I apologize.  It's over 10,000.

Okay.  It looks like about 17,000.

THE COURT:  Okay.  I'm looking -- this is the argument on pages 9 and 10 of your brief?

MR. SOLTER:  Correct.

THE COURT:  So if I'm getting it right, you're basing it on the profits.

MR. SOLTER:  That's correct.

THE COURT:  Why would that be the right number?  Assuming I went that way, why would that be the right number?

MR. SOLTER:  Because that's the statute, 504.

THE COURT:  You can only get profits?

MR. SOLTER: That you either can get statutory damages --

THE COURT: Or.

MR. SOLTER: -- or profits or -- yeah, right, so they have a choice. In this case, most of the defendants wouldn't be able -- are not eligible for statutory damages because of when the copyrights published versus when --

THE COURT: Explain that a little bit.

MR. SOLTER: For statutory damages, it's required that the infringement begin after the registration of the copyright. So if their infringement begins before registration of the copyright --

THE COURT: You can't get statutory damages.

MR. SOLTER: That's correct.

THE COURT: And you're saying -- is it for all of your clients or just some of them that -- what's alleged to have infringed happened after?

MR. SOLTER: Almost all of them. I think there's one or two stores that had that overlap. But, again, without the original copyright images, it's difficult to know.

THE COURT: Okay. Thanks.

Okay.

MR. SOLTER: Sorry.

THE COURT: You were the first person that didn't listen -- you're done.

We started this off saying I just wanted to hear about personal jurisdiction. And, actually, Mr. Solter did that, which is why he had to get up a second time. You were the first person who didn't. So you're telling me, even though you included all sorts of non-personal jurisdictional arguments, you left something out?

MS. CORDER: Yes, I did.

THE COURT: Okay. What was it?

MS. CORDER: I'm sorry, your Honor. This just goes to support why this preliminary injunction can be rejected as far as them having a likelihood of success on the merits. So one thing that has not been raised yet is the false designation of origin. So they alleged this false designation of origin, but they didn't allege a trademark.

THE COURT: That's a Lanham Act claim.

MS. CORDER: Yeah. But they didn't allege a trademark, registered or unregistered. So --

THE COURT: Pause for a second. Are you proceeding on the Lanham Act claim today, or are we really talking about the Copyright Act claim?

MR. DROTER: We're talking about the Copyright Act claim.

THE COURT: Mr. Droter, you're up now. Just do it in whatever sequence you think is best.

MR. DROTER: I'll try to go short and sweet too.

I feel like the first thing I wanted to focus on would be the restrained assets with each of the defendants.

THE COURT: Okay.

MR. DROTER: We talked to our client about what their usual profits are. Their annual profits in the State of Illinois is right around $1 million. And we were able to speak with them. And they, on average, get about a 40 percent net profit, which also does include the loss of sales from advertisements, which they also do right around $10 million of advertising a year. And with that, we were able to analyze that with the defendants in this case. Their net profits would be right around 40 percent as well.

Sorry. To backtrack, our client's is 30 percent. We're saying the defendants' are 40 percent due to the fact they don't necessarily have to advertise their products, unlike our client. So what we did is we took the amount frozen as well as --

THE COURT: How much total is frozen right now? Do you know?

MR. DROTER: Based on what Amazon provided, essentially the entire amount in their store is frozen, which our client does understand isn't reasonably able to --

THE COURT: What is that?

MR. DROTER: -- obtain all of that.

THE COURT: What is that number?

MR. DROTER: For not having it all added up with all the defendants, it's in the tens of millions of dollars, millions of dollars that are currently restrained.

THE COURT: Okay. Anyway, make your point.

MR. DROTER: Our client -- in an effort to try to kind of get an understanding of the actual U.S. sales, Illinois sales, our client has a proprietary program that kind of analyzes and tracks sales on Amazon for each of the defendants. And with that we were able to come up with average U.S. sales for each defendant. We took 40 percent of each one of those sales and essentially took the amount restrained, 40 percent based on the sales. And if there's an excess amount, we're okay with releasing the restrained assets for each defendant. We already did that. If you look at docket number 73-2.

THE COURT: This is the reply brief basically?

MR. DROTER: Yes.

THE COURT: Give me a second. 73-2.

Okay. I'm there.

MR. DROTER: You'll see kind of the analysis that we were able to make.

THE COURT: This is what the spreadsheet was.

MR. DROTER: Yes. So with each defendant, you can see the name, U.S. sales that we were able to calculate, the amount that's frozen, units that were sold.

THE COURT: And the ones -- so the ones where you're proposing to release a number --

MR. DROTER: Yes.

THE COURT: -- it's basically where the amount frozen is greater than your 40 percent figure.

MR. DROTER: Yes.

THE COURT: Okay.

MR. DROTER: And I have already reached out to Amazon yesterday with these figures to have those assets unfrozen.

THE COURT: This is going to sound like a dumb question. Do you get to do that? I thought I froze the whole thing. Maybe I screwed up by doing that. When I say freeze this thing, can you call them up and say, ah, never mind, just freeze half of it?

MR. DROTER: With the TRO, it does say to freeze the whole thing. But as plaintiff is the one that is injured in the TRO, which you're protecting them.

THE COURT: I'm just telling you --

MR. DROTER: Oh, no, you're okay.

THE COURT: No, I'm just telling you. I mean, if you get an order from a judge saying freeze the whole thing, I don't think you have the authority to go to the person who is holding the assets and say, we don't really need the whole thing anymore. Forget what that guy with the judge after his name said. Just freeze half of it.

MR. DROTER: Well, in that case, to stipulate, we can include language in an order from whatever occurs today to include that in there.

THE COURT: All right. Anyway, go ahead.

MR. DROTER: So that was just the first thing I wanted to address because I know a lot of the defendants brought that up in terms of having too much assets restrained. So we have, you know, listened to you from the last hearing, taken into account, reached out to each of the attorneys that are representing the group of defendants. None of them had objections to any of these amounts to be released.

I do believe there's one attorney that we haven't spoken to yet, but we're more than agreeable to do the same analysis with them as well, or any other defendant that comes forward.

THE COURT: All right. What's your next point?

MR. DROTER: Second, I wanted to talk about -- I believe it was one of the evidence pictures that were given to you just showing -- let me find it.

This one.

THE COURT: The one with the white dress at the end?

MR. DROTER: Yes.

THE COURT: Okay. Just so it's clear, that was from -- that was from Ms. Lei I think.

MR. DROTER: Yes, I believe as well.

THE COURT: Okay.

MR. DROTER: I just wanted to bring this up namely because -- so before we filed the lawsuit, we did go through each link to each product, took the screen shot of the ordering page showing that it was shipping to Illinois, which is where the photo -- the plaintiff's alleged copyright photo comes from.

THE COURT: Okay.

MR. DROTER: And, unfortunately, with a lot of defendants in these types of cases, they do generally like to come back and tell their attorneys and send photos that clearly look very different to try to mislead the Court in any of your analysis. So I just wanted to bring that to your attention as well.

THE COURT: Wait a second. Let me make sure I'm understanding what you're saying. This picture here that has plaintiff's alleged copyright that has this black, white, and red striped dress, the person with their right hand on their hip. The second one is what the plaintiff said was the infringing item, which it looks identical. The third is what I'm told by defense counsel is the actual item, which is maybe a similar looking person. But they're wearing a white dress, and their right arm is not on their hip. It's at their side. You're saying that the thing that you said is the infringing evidence was the thing that was actually up there at the time

you filed the lawsuit. And what I'm seeing now is --

MR. DROTER: Yes. And when Amazon complies with the TRO, obviously, the links go down. The product doesn't exist anymore. They remove it from their platform. I just wanted to bring that to your attention, how our client was able to obtain the initial infringing evidence for that.

THE COURT: Okay. Go ahead.

MR. DROTER: The next thing I just wanted to bring up, the copyrighted work versus registered work. The main difference between copyright protected images and an actual registered work, in order to bring the lawsuit, you have to have a registered work, which is why we're here today. But, obviously, we were using the analysis when we were purchasing our test products just to see what stores still ship to Illinois and just to show that they are able to and receive products from them.

THE COURT: Again, I want to make sure I'm understanding just by way of background.

MR. DROTER: Absolutely.

THE COURT: What you're saying is that some of the post-lawsuit purchases that were made may not have been the registered work, but that's not why you were doing them. You were doing them to find out whether these people actually shipped to Illinois. That's what I kind of heard. Did I hear it right?

MR. DROTER: Yes. In both, yes.

THE COURT: All right. Keep going.

MR. DROTER: I just wanted to briefly touch on the joinder topic. I believe it was kind of already brought up. A lot of these defendants do get a lot of their products from a supplier of some type, and then they sell it on these third-party platforms, you know, bringing them all together in terms of the same platform, obtaining things from the same seller, same photographs, very similar photographs. So I just wanted to briefly touch on that.

THE COURT: Okay. Go ahead.

MR. DROTER: Lastly, I did want to bring up -- I'm not sure if the Court is aware of this or not. But the way that Amazon works in terms of their products and listings, every single product size, color, variation of the same product has a different ASIN number or product number that the platform has.

When we reached out and essentially only had the one product at a time, we were unaware of how it works. So we have one ASIN for each product of each defendant. Sometimes there's two if there is more than one product. But there's, you know, eight different combos, ten different combos.

THE COURT: When you say "combos" --

MR. DROTER: Combinations, like a small of this color, or like a medium of this color. That's two different

ASINs. We obtained just one ASIN, and so the sales figures that Amazon produced, a lot of these defendants are saying there's zero sales because the first product that comes up is usually a size that most people don't want to order, like a triple extra large or extra small.

The main buyers, they want you to click -- go away from that main page, which is why they're claiming that there's sales for that specific ASIN, which is why we were wanting to do more analysis in terms of discovery of actual sales from Amazon, which is what we're reaching out to and waiting to hear back on.

THE COURT: What else did you want to say?

MR. DROTER: I think for the most part, that was pretty much it unless you had any questions.

THE COURT: Yeah, I have some questions.

So one of the things a couple of the attorneys for defendants said is that we can't figure out whether the accused image actually matches the deposited image. And we've asked for the deposited image, and we haven't gotten it yet. And I get that this is all happening really quick.

Why haven't you, or are you planning to produce that stuff? And, if so, when? And, if not, why not?

MR. DROTER: When these defendants reach out, like with these cases, they're asking for evidence of the infringing.

THE COURT: Yeah.

MR. DROTER: Which is why, as you know, with a lot of the evidence you received today, we send them the photo of the copyrighted image that they're infringing as well as their own image. With the images themselves, what's protected is not the photo to a T itself. It's to the pose of the model. It's the way the clothes are falling on the model, the pose of the hands of the model, not just specifically that color -- the pattern, yes, but not the color for every single photo, which is why some of them are copied to a T in terms of color, but other ones you'll see the pose is the same.

A lot of tactics that are used, they'll just reverse an image using any type of software, but it's still the same photo and same pose. And the clothes are still falling on the model of the photo in the same way.

THE COURT: So like holding up -- it's the sixth page of the exhibit that Ms. Corder gave me. The picture that's alleged to have been on the defendant's website is somebody wearing what I would call a dark brown dress. That's probably not right because things sometimes change when you photocopy them. A dark brown dress. The person's right hand is hanging at their side. Their left hand is in what I would call a pocket. They're wearing seemingly two different-colored shoes, one gray, one black. I'm not sure who does that.

MR. DROTER: I see that.

THE COURT: Except for, like, 13-year-old boys. And then -- so if the picture -- if the copyrighted image is actually blue -- and I'm not saying that it is. If it is, you're basically saying that doesn't matter because it's the same pose. The dress is hanging the same way. The arms are in the same way. And the fact that it's blue versus brown doesn't really make a difference.

MR. DROTER: And then the top of the head is cropped off.

THE COURT: Yeah, fair enough. Yeah, you can't --

MR. DROTER: Yes.

THE COURT: You can't avoid infringement by cutting off half of some of these pictures.

MR. DROTER: Yes.

THE COURT: Let me ask you another couple of questions.

The suggestion was made by somebody -- I'm forgetting who at this point -- that, wait a second, how do we know that the plaintiff is really the person that owns the copyright on these images?

MR. DROTER: The plaintiff's name --

THE COURT: Is there an affidavit somewhere? And, if so, where is it?

MR. DROTER: If you just look at any of the registered copyrights from the USPTO, it has --

THE COURT: I'm talking about in the lawsuit. Is there something where it said -- where it's alleged -- and not just alleged, maybe supported -- that the plaintiff is the owner of the copyrighted images?

MR. DROTER: We can provide a declaration to that.

THE COURT: That's a no. It's not in there right now.

MR. DROTER: Not off the top of my head that I can think of, other than the actual copyright, you know, registration that's filed with the USPTO does have our client's name on it. It is for the Rotita brand, and that is what is registered.

THE COURT: So, you know, we had a lot of glitches -- I guess what I would call glitches in terms of the filing of stuff here. But what I have is the complaint, the unsealed version of the -- of the full complaint --

MR. DROTER: Okay.

THE COURT: -- which is docket number 35. It's the one that has the actual plaintiff's name on it. It's called unsealed complaint for copyright infringement. So the complaint itself is -- it's about a dozen and a half pages or so, 16 pages to be specific. It only has -- it has an example of infringing stuff, but really just one. That's on page 10.

Then the first attachment to that is basically a list of the -- or various documentation of the registration --

what's alleged to be the registrations. That's about 20 pages worth or so.

Exhibit 2 is for each of the sellers, it's a spreadsheet that has defendant number, name of seller, and link to infringing photo. But I gather what you told me a second ago is that's just an example -- you gave one example for each defendant. There may have been more than one for any particular defendant.

MR. DROTER: Yes.

THE COURT: And that's kind of broken down on an image-by-image basis. But I don't -- aside from whatever the complaint says -- I'm sorry.

The preliminary injunction motion, the only declaration that's attached to that is one from an attorney. And I would say that's largely -- the attorney wouldn't have knowledge of any of the facts, so it's really not there for factual purposes.

So is there something in the complaint, just even an allegation in the complaint, that says, we own this stuff? Because the suggestion was made that this stuff was out there, and you guys -- you guys stole it just as much as they did.

MR. DROTER: In the complaint -- I don't have the exact product. But in the complaint, it does assert that plaintiff does own the registered copyrights to this action.

THE COURT: Another question. A bond amount.

MR. DROTER: I believe it's 5,000 per count.

THE COURT: It's a pretty modest amount right now. I know some of my colleagues have different views about this. This is a case in which there's a bunch of people contesting it. I'm going to ask plaintiff's counsel this, and I'm going to give defense counsel a chance.

So what is the bond for? In other words, when you issue a temporary restraining order, issue a preliminary injunction, the rules say there has to be a bond unless there's good reason not to. Nobody is saying there shouldn't be one. The question is, what's the amount? So the bond is for a purpose. It's to secure something. So what's the bond there to secure?

MR. DROTER: To the best of my knowledge, the bond is there to secure any defendant's right to collect back on anything that the Court may deem their own --

THE COURT: It's Rule 65(c) says it's an amount that the Court considers proper to pay the cost and damages sustained by any party found to have been wrongfully enjoined or restrained. So the question would be, what are -- what would be the cost and damages that might be sustained by somebody who is wrongfully restrained? So what is that exactly? Money doesn't go away. It's the time value of the money.

MR. DROTER: Correct. The stores are -- they're

still able to sell products.  So I would say -- I don't want to make an argument for any defendant, but for plaintiff's side, it's attorneys' fees, research costs, buying costs.

THE COURT:  I'm not sure attorneys' fees are covered by costs.  I got a couple more questions for you.  Pause for a second.

MR. DROTER:  Absolutely.

THE COURT:  I'm putting this question out there for defense counsel.  What is the purpose of a bond in a preliminary injunction?  Why don't you slide over one.  What's it there to cover?

MS. LEI:  Your Honor, the bond is a security posted for plaintiff to compensate defendants for wrongfully enjoinment because they're entitled to be --

THE COURT:  What does that mean?  What would be the compensation for being wrongfully enjoined?  What does it consist of?

MS. LEI:  For instance, my clients, that particular instance, they list it.  So they cannot sell products over Amazon.  And there is of course -- in order to promote that --

THE COURT:  I think I heard Mr. -- I blanked on your name already.

MR. DROTER:  Droter.

THE COURT:  Right.

Mr. Droter saying, is that -- maybe that website is

blocked, but you could open another one just as easily.

MS. LEI: It's not that easy, your Honor. They have to spend money and effort on promoting a particular listing, and sometimes it can be substantial money spent. And, also, in order to sell that particular listing, they have to put up inventory. So sometimes because of those lawsuits, and Amazon, they might even destroy their inventory. So there can be real substantial --

THE COURT: Who would be destroying the inventory?

MS. LEI: Amazon. Yeah. They might.

THE COURT: Again, I'm going to display my ignorance. So if I'm an online store selling on Amazon, you're saying that Amazon's actually got my inventory?

MS. LEI: So here's what's going on with Amazon. It's Amazon's policy. Right? If Amazon suspects a particular store is selling alleged infringing product, because if there is a TRO, they delete that particular listing. And, also, sometimes they might do some additional enforcement action against that particular store because of the association with this lawsuit. And in order for those sellers to sell a particular item, sometimes they have to ship the inventory to the warehouse.

THE COURT: In other words, they got to send it to Amazon's warehouse so that Amazon can actually promise you that two-day delivery or whatever it is that --

MS. LEI: Something like that. Yeah. And if they associate with the lawsuit, they might even destroy the inventory saying that because you violated Amazon's policy.

THE COURT: It's the cost of establishing a new website. It's the loss of the inventory. What else?

MS. LEI: Lost sales. And, also, marketing. Sometimes they really spend like real money on marketing. And shipping, they ship their product from China to the U.S.

THE COURT: Okay. All right. Thanks.

Anybody want to add anything to that at all? Or is that kind of close enough?

Mr. Urbanczyk?

MR. URBANCZYK: Your Honor, just briefly. In addition to that, it should be noted the bond amount limits the scope of the defendant's recovery for being improperly enjoined.

THE COURT: I get it. In other words, you can't go above the bond.

MR. URBANCZYK: Separate from that, there is the time value, which is just interest. But in the situation, for example with our group of defendants, the sales weren't very large. So we wouldn't -- our clients would be complaining about the fact that they would otherwise have been earning lots of revenue if not for the injunction. But the amount of money that was frozen could be used to purchase inventory or

for other marketing purpose.

THE COURT: And you've lost the ability to use that for other purposes, basically.

MR. URBANCZYK: That's correct.

And in the e-commerce context, it's not a rat race, but you're in a hampster wheel of keeping your listings up among all the thousands or millions of other storefronts that are selling particularly fast fashion items. So being deprived of that money --

THE COURT: In other words, there's a lot of sites selling the same or similar stuff --

MR. URBANCZYK: That's correct.

THE COURT: -- is what you're saying.

MR. URBANCZYK: So just the preliminary injunction or the temporary restraining order hasn't been in place for that long, but absent that money, to keep marketing, defendants in our position, we're going to be behind the eightball afterwards.

THE COURT: Okay. Let me go back to Mr. Droter for a second. I think I had one other -- actually, this is kind of a general question. So have you guys filed other lawsuits in this district on behalf of this particular plaintiff?

MR. DROTER: Yes.

THE COURT: You have. Did you have this many defendants coming in and defending them?

MR. DROTER: This would be the only one.

THE COURT: Me too. I mean, honestly, me too. You know, I see -- I see, quote/unquote -- I see Mr. Urbanczyk a lot. But never -- almost never this early. All right? Every now and then I see Mr. Urbanczyk file an appearance before the preliminary injunction hearing, but usually it's after. And it's not because anybody is asleep at the switch or anything like that; it's because things happen pretty fast.

I've had a couple of cases -- and I've been doing this as long as anybody around here. I have had a couple of cases where I've had maybe two or three defendants or groups of defendants represented, never had five or six before. I never had one where I had anything anywhere close to this contested at the preliminary injunction stage.

So any clue why it happened this way in this case? Why they're on this so much faster than most people would be?

MR. DROTER: To answer your question, your Honor, I don't have a good answer either. This is a first for me as well in terms of this much contesting on. My only guess could be the assets restrained were much higher --

THE COURT: Than the normal amounts.

MR. DROTER: -- than normal. So it probably prompted a lot of these defendants to instead of run just away and open a new store, they wanted to try to get their money unrestrained.

THE COURT: Somebody's got 400 bucks frozen. They maybe say, just chalk it up to the experience, move on.

MR. DROTER: That would be my best assumption for why.

THE COURT: That's as good as anything. Okay.

Does anybody else want to say something that you haven't already said?

MR. DROTER: I do want to say one thing before I head down. I just want to reiterate that our client, they only sell from their own website store. They don't sell on any third-party platform. But when you do go to, for example, Amazon, type in Rotita, their search terms pop up. You can click thinking that you're essentially going to buy their products. There have been a lot of these defendant stores will pop up in that search front. That was the last thing I wanted to add.

Thank you.

THE COURT: Okay. Thanks.

MR. SOLTER: Your Honor, may I say something briefly?

THE COURT: Yes.

MR. ADAMS: You had asked plaintiff's counsel why he hadn't provided the deposit copies to defendants. I don't believe you received an answer to that question.

THE COURT: I think he said he hadn't gotten around to it yet.

MR. DROTER: Do you want -- as they've been describing -- I can come back up.

THE COURT: Yeah.

MR. DROTER: My answer to that question was when each defendant reaches out, we send the infringing evidence showing their product listing --

THE COURT: Yeah, but what about this whole thing about the deposit items?

MR. DROTER: I think the defendants -- they're just wanting to see this giant group of photos, when in reality they're just infringing part of that group of photos. We're narrowing it down.

THE COURT: What you're saying is that for any particular defendant, you've given them the material, the copyrighted material for this item --

MR. DROTER: And then you see that in the evidence that you've been receiving today, what we've sent them; what the product was; and then for some of them, what the test products have been.

THE COURT: Okay. Your view on -- your -- assuming I grant a preliminary injunction, you're willing to lower the numbers as indicated in that spreadsheet.

MR. DROTER: Yes.

THE COURT: But what's your view on the amount of what the bond ought to be?

MR. DROTER: Plaintiff's position, in our motion, we are -- plaintiff is okay with increasing the bond from 5,000 to 10,000 if the Court finds that --

THE COURT: That's 10- total for everybody in the case, right? And the law is pretty clear that the bond amount caps out the recovery from anybody who is wrongfully enjoined, so that would be basically a nice way of saying that however many defendants are represented here, plus anybody else who isn't, they can all kind of -- it would be kind of like sharks going at the stuff that gets thrown in. They can all go for the $10,000, but that's it.

MR. DROTER: Correct. And with that, lowering the amounts that are restrained, plaintiff argues that the preliminary injunction should be entered today.

THE COURT: Is today the day that the TRO expires?

MR. DROTER: Yes. End of day today, but today it was the day it was extended to.

THE COURT: Yeah. Thank you.

All right. Is there anybody else on the defendants' side who hasn't said something that you want to say?

MR. ADAMS: I'm sorry, your Honor, to keep beating a dead horse. But the key on receiving the deposit copies is that it has the publication date of the photos, which is key to, I think, a lot of the defendants to knowing when were these photos that we're accused of infringing published.

Because I think several of us have evidence that the photos --

THE COURT: What's the date that you made the request to the plaintiffs to provide that to you?

MR. ADAMS: Sorry. Again, your Honor?

THE COURT: What's the date that you made the request to the plaintiff to provide --

MR. ADAMS: I can't remember the exact dates, but I know that I've --

THE COURT: Less than four weeks ago. We know that because that's when the TRO --

MR. ADAMS: I've requested it at least four times, specifically the deposit copies, not just evidence of infringement. I specifically said I need the deposit copies to be able to adequately respond.

THE COURT: The reason for that -- because I want to make sure -- the reason for that -- the reason for that is that because the copyright is obtained for a group of photos, all you know right now is what the date range is. You don't know the specific dates for the specific items that your client is alleged to have infringed.

MR. ADAMS: Exactly, your Honor.

THE COURT: Okay. And why is that a reason why I shouldn't give a preliminary injunction?

MR. ADAMS: Because it --

THE COURT: I mean, these things kind of necessarily

happen fast.

MR. ADAMS: They don't have proof.

THE COURT: Have you guys answered any of the discovery requests that were propounded by the plaintiff yet?

MR. ADAMS: No, your Honor.

THE COURT: Why not?

MR. ADAMS: We haven't -- I haven't been served with any discovery requests.

THE COURT: It's pretty common in these things to do that right at the beginning. Have you served any of the defendants with discovery?

MR. DROTER: I do not believe with official discovery.

THE COURT: What other kind is there?

MR. DROTER: Email requests.

THE COURT: Oh. Okay. Got it. Yeah.

MR. ADAMS: My point, your Honor, is that without those dates, they don't have proof that we copied them. Because we have declarations that show that our stores published these photos.

THE COURT: These are the declarations that you have not filed?

MR. ADAMS: I have filed those declarations.

THE COURT: Which?

MR. ADAMS: The part of 65.

THE COURT: Okay. While you're there --

MR. ADAMS: Exhibits 1, 2, and 3.

THE COURT: 65-1, 2, and 3. 65-1, is a declaration of someone names Sammi Li, S-A-M-M-I, L-I, and says: "We got this from the clothing supplier." The file properties say that the photo was taken on 10 -- October 10, 2022.

What is that supposed to tell me? What is that supposed to tell me with relation to the argument you're making right now, which is that we need the deposit copy?

MR. ADAMS: Because the date that photo was taken is before the publication date in the range for the copyright that they're asserting.

THE COURT: So what? I mean, I would assume that a photographer who takes a photograph on day 1 does not instantaneously deposit it with the copyright office. They take it on day 1; deposit it on day 5, 10, 100, 150, whatever.

MR. ADAMS: It's the date that the photo from my client's store was taken.

THE COURT: That's not in the affidavit, though.

MR. ADAMS: It is. It says the photo was obtained from our supplier. The supplier has metadata for that original photo.

THE COURT: It doesn't say anything about when -- I mean, as far as I know, the supplier got it from the plaintiff too. All of this -- all this affidavit tells me is the date

the photo was taken. It doesn't tell me when you guys published it.

MR. ADAMS: The other two, you're correct. I think that one declaration doesn't say when we published it. The other two declarations do specify when we published it.

THE COURT: Okay. So declaration -- the declaration of Sue Su, S-U-E, S-U, says on that particular photograph, the metadata says it was taken August 3rd, 2023. We first published it on September 11, 2023. Again, what's that supposed to tell me?

MR. ADAMS: If the plaintiff's copyrighted photo was published after that date, there is no way we could have copied it. And they say the way they've been publishing their photos is by posting them on a website and that we're copying the photos from their website. If we published the photo on our website before they published it on their website, there could be no copying.

THE COURT: Okay. Maybe again, this is -- you're not supposed to preface comments by saying this is going to be a dumb comment, but I'm going to do it for a third time. This is going to be a dumb comment.

I'm actually not quite tracking that. Because, I mean, it's at least possible here -- I mean, your person says -- and this is Exhibit 2 to your submission; it's docket number 65-2 -- we got the photo from the supplier of the

clothing product that's depicted in the photo. That's what we're selling. So we wanted to display that photo there. The photo was taken August the 3rd. We first published it on September the 11th.

And basically you're saying that unless the plaintiff -- fill in the verb. Unless the plaintiff had blanked it before September 11th, then we didn't infringe.

What's the blank?

MR. ADAMS: Published. And the deposit copies tell you the publication date.

THE COURT: What's relevant for copyright infringement, or one of the things that's relevant, is the plaintiff has to, quote, have published the photograph before the defendant used it.

MR. ADAMS: Correct.

THE COURT: In other words, you can't just have it in a folder somewhere. You have to have published it.

What does publish mean?

MR. ADAMS: Correct. Because that's how they're trying to establish that we copied it. If it was in a folder, how could we have possibly copied it?

THE COURT: Unless the people you got it from grabbed the folder from them.

MR. ADAMS: Right.

THE COURT: How do I know that didn't happen?

MR. ADAMS: They're alleging that we copied it from their website, which would be their publication date. I just find it suspicious that all of the defendants have asked for those deposit copies that have the publication date. And for some reason they're refusing to provide that.

THE COURT: So that's -- when you say "refuse," nobody has told you we're not going to do it. You just haven't gotten it.

MR. ADAMS: We haven't received a response.

THE COURT: So one of the things that the plaintiff has been doing over the last two weeks is putting together a reply to five separate responses to a preliminary injunction motion that totalled pages of which is about 400, so they might have had something else going at the time. Don't say refused. Just say you haven't gotten it yet. Refused means I said no. Okay. That's not what happened. So --

MR. ADAMS: Correct, your Honor. They didn't specifically say no.

THE COURT: How hard would it be for the plaintiff to produce the deposit copies, just in their totality? How many images are involved in this case total, ballpark?

MR. DROTER: Images themselves -- I know the deposit images, as we said, is a wide span of photos.

THE COURT: Yeah. Okay.

MR. DROTER: But the actual infringing photos in this

are pretty similar. There's, from what I can see, you know, not thousands of photos. They're pretty much the same stylized photo.

THE COURT: The point that Mr. Adams is making is that when these things get deposited with the copyright office, it's a whole bunch of photos. And so to prove -- maybe it's not lead-pipe cinch, but one important piece of evidence as it relates to any particular photo is the publication date, which has to be on the individual image that's deposited with the copyright office, which that's the way I'm understanding his argument.

I can't say he's wrong. I mean, I get that. What it ends up showing is a matter for another day. But what would it involve for the images that are involved in this case to produce the deposit copies?

MR. DROTER: I don't foresee it being, you know, a lengthy, difficult task. I would say it's doable, able to produce to them if it --

THE COURT: And the reason you haven't done it that way so far is what? I get what you did, but why haven't you done it the way that at least a couple of ways these folks say they requested it.

MR. DROTER: Essentially to prevent what a lot of the defendants have been arguing when they -- we'll send a photo of something that's, you know, completely different than the

infringing photo that we sent with the initial evidence because they're just going to pick and choose little photos out of that giant rolodex of photos of that copyright and say, it doesn't match. We're not infringing. So that's why we individually are sending each defendant the evidence of their infringement.

THE COURT: I see.

Okay. Thanks.

MR. ADAMS: Thank you, your Honor.

THE COURT: All right. I'm going to try to -- just orally, I'm going to try to deal with these arguments, not necessarily in the exact sequence in which I got them. I think the personal jurisdiction argument I think as an original matter, it seems to me that just a simple allegation that a defendant has a website that's available to people in Illinois and that they're ready, willing, and able to sell products to people in Illinois isn't by itself enough to establish personal jurisdiction. Doesn't seem to me that there's a whole lot of difference between that and just having what the Seventh Circuit has referred to as an interactive website that's available in the jurisdiction.

It seems to me there has to be more than that. Certainly a sale is enough. I think there's a reasonably good question about whether something short of a sale would be enough. I think, though, that although the plaintiff doesn't

seem like they've actually -- based on the reply brief, they haven't actually acquired or taken the steps necessary to acquire items from each of the accused defendants, I think that -- and although there's a question whether a post-lawsuit sale would be enough by itself, it would be easy enough to get around that. The personal jurisdiction issue doesn't seem to me to be a strong enough issue on the defense side to prevent issuance of a preliminary injunction. There's certainly some further litigation that could happen on that down the road. But for this purpose, I don't think that's enough.

All right. That's personal jurisdiction.

I don't think that the misjoin -- that the argument about misjoinder is a sufficient basis, is an appropriate basis to deny a preliminary injunction either, pretty much for the reasons that I've said, and also because I think there's enough evidence in this case that would indicate that if nothing else, the defendants are all getting the infringing material from a common source. Or at least overlapping common sources, which I think is enough to make these a series of transactions or occurrences within the meaning of the rule.

On the question of copyrightability, the specific subpart of that, whether it's the plaintiff's image, I think that, for present purposes, I think the plaintiff has got enough to show a likelihood of success on that. I'm not saying it's free from doubt, but that's not the standard.

It's been alleged, and it hasn't been, I think, adequately controverted at this point, to put that into serious question.

Mr. Adams' argument about the deposited images and this issue about dates, that's a serious argument. And I don't want to attribute that just to Mr. Adams. I think other people made that argument too. Ms. Corder made that argument, I guess probably before Mr. Adams did.

I think that there is sufficient evidence at this point to show that the defendant -- each defendant who is in here opposing a preliminary injunction used the image after the plaintiff had the rights to it by virtue of the registration. Again, maybe for individual images, there's some potential for doubt about that, but I think the plaintiff has shown an adequate likelihood of success on the merits on that point as well.

I think that the -- so for all of those reasons and for the reasons that are stated, I think that the plaintiff has shown a reasonable likelihood of success on the merits. I think the plaintiff has also shown for purposes -- sufficiently for purposes of a preliminary injunction irreparable harm for which there's no adequate remedy at law. And that's -- you know, I rely on the case law involving intellectual property rights, generally copyrights, trademarks, and so on, that the sort of ubiquitous use of a particular item by other people is sufficiently damaging to

goodwill in a way that can't be adequately compensated by damages, or at least is very difficult to determine.

I think where we've got some issues -- a place where we've got some really serious issues I think has to do with balance of harms, and that's really partly a function of the amount that's being seized or frozen here.

The defendants, you know, many of them at least, if not all of them, are selling other products besides the ones that are alleged to have been done using the accused images and, therefore, have in the accounts that are frozen with Amazon or whatever other platforms they have their accounts with, PayPal, whatever, in some cases are significant multiples of that. You know, an argument is sometimes made that, well, statutory damages, but the plaintiff isn't really making that argument here. The statutory damages can be a very large amount.

The plaintiff is relying on profits. Part of the problem with that is that -- actually, this was one of the questions I intended to ask Mr. Droter, but I neglected to ask him.

The thing that you said, Mr. Droter, about the 30 percent profit margin that you said your clients are getting on that, that's not in the record right now, right? Did I get that right?

MR. DROTER: That is in the record.

THE COURT: You said you discussed it with your clients. Where is it in the record if it's in the record?

MR. DROTER: It should be docket number 76, declaration of Liangjie Li.

THE COURT: There's a lot in there. Declaration of -- I'm sorry. I'm going to pull it up a different way because what I downloaded is the wrong thing. You said 76.

MR. DROTER: Yes.

THE COURT: Here it is. I did download it the right way. One second.

What paragraph is the thing that talks about your client's profit margin? Oh. Paragraph 12. The plaintiff expects to earn a net profit of approximately 30 percent of the sale of its Rotita brand products. This figure includes substantial advertising expenses and so on.

Okay. And the reason that your -- the reason, as I heard before, and as this affidavit seems to say, for suggesting a higher margin for the defendants is that they don't have the advertising expenses because they're basically just piggybacking onto your folks's thing.

MR. DROTER: Correct. Yes.

THE COURT: I see what you're saying.

Yeah, I think that's reasonably supported here. That, you know, restraint of the lower amounts that are proposed by the plaintiff in the spreadsheet that was provided

earlier. I know the spreadsheet isn't part of the record, but it's -- I've got it, and it kind of lists those amounts.

MR. DROTER: I believe the spreadsheet is part of the record.

THE COURT: Maybe it is part of the record. Okay.

So that would need to be lowered because otherwise I think the balance of harms would tip the other way. And then that gets us down -- so the balance of harms with the lowered amount tips in favor of the plaintiff. And there's really no harm to third parties here; so that's not really a consideration. So I think the plaintiff has established the requirements for a preliminary injunction.

But then we've got this issue about the bond amount. And I have to say I'm in a bit of a quandary about that because -- I mean, some serious issues have been raised here, and there are probably other issues that will be raised down the road about copyrightability and things like that. And I am just not comfortable with a total amount, you know, that would be consistent of what you would see in cases where -- so of the, you know, hundreds and probably, at this point, more than hundreds of cases like this that I've seen here, what happens in probably 98 percent of them is that they just proceed by way of a default judgment. Or maybe there are some settlements that the plaintiff makes. But it essentially all goes away because largely the defendants go away. Or they

don't ever respond to the lawsuit.

This case, for whatever reason, is a bit different. And it just doesn't seem to me that $10,000 total is enough to cover the types of expenses that Rule 65 -- the types of losses that Rule 65(c) says the bond is supposed to cover, given some of the, I think, serious, although not winning issues, for purposes of a preliminary injunction, serious issues that have been raised.

I think the way -- the types of items that I believe it was Ms. Lei said -- maybe it's Lei, apologies for mispronouncing your name if I did -- the types of things that she said would be covered potentially within the rubric of costs and damages sustained by a party found to have been wrongfully enjoined, the types of items that she described there are all potentially recoverable. It's really hard for me to assess up front the likelihood, the percentage of likelihood of wrongful injunction other than to say that I think enough serious issues have been raised which suggests that that number is -- the $10,000 total is too low.

The thing that -- you gave me something earlier. I just need to find it here. The thing that you gave me that listed the -- that had the yellow highlighted stuff on it, where was that? Is that something you handed me, or was that something that was filed?

MR. DROTER: That was filed. I can find it again to

tell you the docket number.

THE COURT: Yeah, just tell me again what docket number it was. It was the spreadsheet where you had the lowered bond amounts. It's probably going to be part of 76. Maybe not.

MR. DROTER: It's docket 73-2.

THE COURT: Thank you.

MS. LEI: Your Honor, just one point.

THE COURT: I am in the middle of ruling, so you don't get to talk yet. So just make a mental note of what you want to say, and you'll tell me in a minute.

Okay. So I know that -- I think that maybe not all of the defendants are on there. Perhaps Ms. Lei's clients aren't because she's just recently filed an appearance. But if you look at -- and I know this is not, you know, a mathematically accurate calculation. If you look at the total numbers that would be continued to be restrained among those who have contested -- yeah, I really can't figure that out from this, can I?

MR. DROTER: I can help clarify.

THE COURT: Yeah, go ahead.

MR. DROTER: All of these defendants listed in 73-2 are defendants that are represented by attorneys that are in this room with the exception of the appearance that just came in. So you see --

THE COURT: Who is Keaton David Smith?

MR. SMITH: That's us.

THE COURT: That's you. Sorry.

MR. DROTER: And Shengmao Mu, both of them, in addition to -- I think you filed your appearance yesterday.

THE COURT: So is it true then that you guys -- and this would be Ms. Corder and Mr. Smith -- you guys have somebody who has the biggest number. You've got somebody who has $174,000 restrained at this point?

MR. SMITH: I believe so, your Honor, yes.

THE COURT: Okay. So that money won't go away. So the amount restrained isn't the right number. So that money won't go away. The losses, the damages that somebody could incur, you know, consistent with what's been suggested include things like -- time, value, money is not that big a deal here because the interest rates are not massive at this point in time.

It's the lost opportunity cost of not having that money to use for other things, which means, essentially, you have to go out and borrow -- from an economist's standpoint, you'd have to go out and borrow it. And there's a cost to borrowing money, an interest rate to acquire the money to substitute for the money in your account that you can't use anymore.

There's the proposition that the websites are

essentially frozen and that in some instances it's possible that inventory may have been destroyed or not otherwise be available, though I don't really have any evidence of that at this point.

So, basically, the conclusion I'm going to reach -- and these are rough -- everything's a rough judgment at this point. You're going to need to have a bond of $250,000 to secure the injunction. I think that's sufficient to cover the amount that's contemplated by Rule 65(c), which isn't the amount frozen because the money, again, isn't going to go away anywhere.

So what I need you to do is draft an order that makes -- that includes findings. If you want, you can include in the order that it incorporates by reference the oral ruling made in open court and just summarizes the conclusions. And get me a Word version of that before the end -- let's say by -- it's 11:20 right now -- by 3:00 o'clock because I got to get something entered today. And include the thing about the bond.

And -- but then what's going to need to happen in this case -- it's a preliminary injunction. There's a lot of money frozen here. And this is going to need to proceed on a pretty expeditious basis. So once the order is in place, what I'm going to direct you to do is confer, everybody confer to establish a schedule. I think I'm just going to peremptorily

say that the deposit copies of the copyrighted material that's involved in the lawsuit need to be produced to defense counsel within the next ten days.  That's ten calendar days, not ten business days, whatever that ends up being.  That probably ends up being a Sunday.  So then it would be the Monday.

And then I want you to confer about a schedule for discovery and anything else that we need to have a schedule on.  File a joint status report two weeks from today.  That's the 19th.  I'm going to set it for a telephone conference on the 26th of June at 9:00 o'clock.  The conference line number will be in the order.  But if we don't have anything to talk about, in other words, if there's an agreed-upon schedule, I may just vacate the status.

So there you go.

MR. DROTER:  For the June 26th, is it at 9:00 o'clock, just to confirm?

THE COURT:  9:00 o'clock, yeah.

I see a hand raised.  Ms. Corder.

MS. CORDER:  Yes, your Honor.  We understand that an answer to the complaint --

THE COURT:  So just figure out a date for filing answers.

MS. CORDER:  Between --

THE COURT:  Between the sides.

MS. CORDER:  Okay.

THE COURT: Yeah. That can be reasonably relaxed, I think.

MS. CORDER: Great. Thank you.

THE COURT: Anything else anybody's got?

Okay. Thanks for coming in today.

(Which were all the proceedings had in the above-entitled cause on the day and date aforesaid.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ *Carolyn R. Cox, RPR, F/CRR*_____ June 6, 2024
Official Court Reporter
United States District Court
Northern District of Illinois
Eastern Division